929 P.2d 1362

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Mark A. BRANTLEY, Defendant–Appellant.**

No. 18611.

Intermediate Court of Appeals of Hawai'i.

Nov. 15, 1996.

As Amended Nov. 26, 1996.

Kyle B. Coffman, on the briefs, Wailuku, for defendant-appellant.

Victoria J. Hamilton, Peter A. Hanano and Artemio C. Baxa, Deputy Prosecuting Attorneys, County of Maui, on the briefs, Wailuku, for plaintiff-appellee.

Before WATANABE, ACOBA and KIRIMITSU, JJ.

ACOBA, Judge.

In this appeal by Defendant–Appellant, Mark A. Brantley (Defendant), we hold that the trial court did not err in admitting autopsy photographs of the murder victim involved and that there was sufficient evidence to convict Defendant of second degree murder on the basis of accomplice liability. However, we also hold that the sentencing court did err in sentencing Defendant to a mandatory minimum term of imprisonment under Hawai'i Revised Statutes (HRS) § 706–660.1(3)(a) (1993) for use of a semi-automatic firearm in the commission of a felony, because there was no trial finding that Defendant actually or constructively possessed such a firearm at the time of the murder.

I.

Defendant was indicted on the charges of place to keep firearm in violation of HRS § 134–6(b) (1993),[1] terroristic threatening in violation of HRS § 707–716(1)(d) (1993),[2] kidnapping in violation of HRS § 707–720(1)(d) (1993),[3] carrying or use of a firearm in the commission of a separate felony in violation

---

1. Hawai'i Revised Statutes (HRS) § 134–6(b) (1993) provides that "[i]t shall be unlawful for a person to knowingly possess a firearm with the intent to facilitate the commission of a felony offense involving the distribution of a controlled substance, whether the firearm was loaded or not, and whether operable or not."

2. HRS § 707–716(1)(d) (1993) states that "[a] person commits the offense of terroristic threat-ening in the first degree if the person commits terroristic threatening [w]ith the use of a dangerous instrument."

3. HRS § 707–720(1)(d) (1993) provides that "[a] person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to [i]nflict bodily injury upon that person or subject that person to a sexual offense[.]"

of HRS § 134–6(a) (1993),[4] and second degree murder in violation of HRS § 707–701.5 (1993).[5] A jury found Defendant guilty on all charges, except for the terroristic threatening charge as to which it returned a not guilty verdict.

Defendant was sentenced to concurrent terms of ten years imprisonment on the place to keep a firearm charge, twenty years imprisonment each on the charges of kidnapping and carrying or use of a firearm in the commission of a separate felony, and life imprisonment with the possibility of parole on the second degree murder charge. Additionally, the court imposed a mandatory minimum term of twenty years imprisonment without the possibility of parole or probation on the murder charge, pursuant to HRS § 706–660.1(3)(a) (1993).

Judgment was entered accordingly on November 4, 1994.

## II.

The following evidence was introduced at the jury trial held on July 12 to 14 and July 18 to 19, 1994.

Defendant and T.J. Jensen (Jensen) were roommates and co-workers at several construction sites on the island of Maui. They were also co-owners of a marijuana patch. After discovering that their harvest had apparently been "ripped off," the two men went to find the poachers. Following some inquiries, they discovered that their stolen crop might be located at the homeless persons' community in the Naskas Beach area in the town of Kahului.[6]

On September 3, 1993, the two men bought a Ruger mini–14 semi-automatic rifle (rifle) from Kevin Paki Makekau (Makekau) for $450. Makekau was working as a "bouncer" at a party when Defendant and Jensen drove up in a truck. Jensen approached Makekau regarding the purchase of the rifle. After Makekau quoted the price to him, Jensen "went back to the truck to talk to [Defendant]." Defendant gave Jensen the money to buy the gun before Jensen handed the money to Makekau. The three men then drove to Makawao[7] to telephone Elvis DeRego (DeRego), Makekau's roommate. Makekau instructed DeRego to give the rifle to Defendant and Jensen. Ammunition was included in the weapon sale.

Makekau returned to the party, and Defendant and Jensen proceeded to Makekau's house. There, DeRego and his girlfriend delivered the rifle and ammunition to them. Defendant stood next to Jensen at the time the rifle and ammunition were handed to

4. HRS § 134–6(a) (1993) states the following:

§ 134–6 Carrying or use of firearm in the commission of a separate felony; ... (a) It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not; provided that a person shall not be prosecuted under this subsection where the separate felony is:
(1) A felony offense otherwise defined by this chapter;
(2) The felony offense of reckless endangering in the first degree under section 707–713;
(3) The felony offense of terroristic threatening in the first degree under section 707–716(1)(a), 707–716(1)(b), and 707–716(1)(d); or
(4) The felony offenses of criminal property damage in the first degree under section 708–820 and criminal property damage in

the second degree under section 708–821 and the firearm is the instrument or means by which the property damage is caused.

5. HRS § 707–701.5 (1993) sets forth the following:

§ 707–701.5 Murder in the second degree. (1) Except as provided in section 707–701 (murder in the first degree), a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.
(2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

6. Naskas Beach is the local term for the Kanahā Beach area located in Kahului.

7. Makawao is a land section and village on the island of Maui.

Jensen. With the rifle and ammunition, Defendant and Jensen set out to locate their missing marijuana.

At about midnight, on September 4, 1993, Defendant and Jensen drove to the Naskas Beach area. They arrived at the camp of James Ernest Tau'a Gleason (James) and Christine Ilima Gleason (Christine) (hereinafter referred to as "the Gleasons' camp").

James and Christine were in their tent when they heard noises from outside. When James exited the tent, he was immediately confronted by Defendant and Jensen. Jensen pointed the rifle at James and demanded to know where the "pot" was located. Defendant, holding a club used for killing fish, also threatened James.

Hearing "a lot of yelling and screaming," Christine left the tent to investigate. Defendant approached Christine holding the club "in a striking position" above his head. Defendant "grabbed" her shoulders and told her "if [she] didn't want to die like [her] husband to tell [Defendant] where [Defendant's] weed was." According to Christine, Defendant appeared to be more in control of the situation than Jensen because he did most of the talking and was able to "calm down" Jensen.

Jensen poked at James with the barrel of the gun causing injuries to James's lower back. James produced one marijuana plant and told the two men that that was all he had. James admitted that his cousin, Nelson Wilhelm (Wilhelm), and someone named Tom Cash had given the plant to him. During this time, Jensen pointed the rifle at James's head, neck, chest, and back. Both men threatened to shoot James if Wilhelm was not found. They ordered James to drive them to Wilhelm's camp, which was about a quarter of a mile away.

Eugene Midao (Midao) had a campsite close to the Gleasons' camp. On the night of the incident, Midao heard the Gleasons pleading with someone not to hurt them. Midao saw Jensen holding a rifle and Defendant holding a flashlight and a club. While Jensen pointed the rifle at James, Midao heard Defendant "[d]emand[ ] to know where the rest of the weed was."

Clifton Weber (Weber), who was staying at a tent about 50 yards from the Gleasons' camp, "heard scrambling." When Weber went to the Gleasons' tent, Christine warned him against going to the parking area because one of the persons there had a gun. Weber disregarded Christine's warning and approached the Gleasons' vehicle, a "Bronco." There he saw Jensen holding a rifle. Jensen pointed the rifle at Weber's "gut level" and ordered him to get into the Bronco. When an argument ensued between Defendant and Jensen regarding Weber, Weber fled through the brush to Kahului Harbor to use the telephone there.

After Weber fled, James drove Defendant and Jensen to Wilhelm's camp. Jensen sat in the front seat and held the rifle, and Defendant sat behind James in the rear seat. Upon their arrival, Jensen ordered James to "call [Wilhelm] out.". James called twice for Wilhelm. As soon as Wilhelm appeared, Jensen "rush[ed] him from the side of the car." According to James, Jensen began to yell at Wilhelm and "tried to poke at him with the [rifle]." Wilhelm "side stepped" the rifle and ran away.

At this point, Jensen fired a shot in the direction of Wilhelm's flight. Defendant stood next to Jensen when Jensen fired the shot. Jensen then said "get 'em," and Defendant and Jensen ran after Wilhelm. James heard a second shot followed by Wilhelm's "painful scream." Not long after James heard a third shot, he saw Defendant running towards him. Defendant had the keys to James's Bronco. As James tried to grab at the keys, Defendant pulled the keys back, wiped them on his shirt, said "no prints, no evidence," threw the keys to James, and ran off.

Jensen arrived five to ten seconds after Defendant and told James "[his] friend's dead" before running down the road. James "jumped back in" his Bronco to return to his camp.

When James arrived at the main road, he saw Jensen standing in the middle of the road. Jensen pointed the rifle at James and ordered him to stop. Jensen got into the Bronco, and James continued driving back to his camp. Along the way, they came upon Defendant "running down the road." Jensen told James to "slow down," and Jensen told Defendant to "get in the [Bronco]." Defendant complied and James drove the two men to their truck, after which Jensen and Defendant left the area.

At the time of this incident, Johnell Villegas (Villegas) and her family were living in the Naskas Beach area. Her family's campsite was one or two feet from Wilhelm's camp. Around midnight of September 4, 1993, she and her boyfriend heard "[Wilhelm] pleading for help." After she left her tent, she saw "[Wilhelm] coming into [their] camp ... limping, [and] holding his chest." Villegas also saw Defendant "holding a club" chasing after Wilhelm. Defendant, "the club man," dragged Wilhelm from the bushes and beat him with the club.

Jensen ran up to Defendant and Wilhelm. Both Defendant and Jensen continued to "cuss[ ]" and "beat[ ]" Wilhelm. Then, Villegas saw Jensen, "the gun man," shoot Wilhelm while Wilhelm was kneeling on the beach. After the first shot, Villegas heard Defendant warn Jensen to leave because "the cops" were going to be called. Villegas's "Dad" called the police before the shot was fired.

Allan J.J. Tinao (Tinao), Villegas's boyfriend, related that he observed Defendant and Jensen chasing Wilhelm and that Defendant was "hitting" Wilhelm on the head. As Wilhelm ran towards Tinao, Tinao saw him "holding his chest" and his clothing "was all blood." Wilhelm hid in the bushes. At this point, Defendant approached Tinao to find out where Wilhelm had gone. Defendant found Wilhelm, "grab[bed]" him "by the hair," "pull[ed]" him "out of the bushes,"

"club[bed] him on the head," and struck Wilhelm on the back and in the ribs. Tinao saw Defendant approximately 15 feet away from Wilhelm when he heard Jensen declare that Jensen was "going to kill [Wilhelm]...."

Sandra Roselani Muller (Muller) was also living in the Naskas beach area on the night of the incident.[8] From inside her tent, she heard Wilhelm's breathing while Wilhelm was in the bushes alongside the tent. Muller heard the gunshots and some "guy call[ing] out the name, Mark [Defendant's first name]." She heard someone say, "let's go [be]cause someone called the cops." Immediately prior to hearing the last shot, Muller heard another voice say, "I'm going to waste him."

Lee Smith Kekoa Akima (Akima) was living with Muller at the time of the incident and observed the same events.

Jensen admitted killing Wilhelm on September 4, 1993, using a "mini-Ruger 14." Defendant gave him the money to purchase the rifle. According to Jensen, Defendant "was not standing right next to [Jensen] when [he] pulled the trigger," but Defendant was with Jensen before and after the shooting. Jensen acknowledged that Defendant drove Jensen to hide the gun.

Dr. Kanthi DeAlwis (Doctor), the First Deputy Medical Examiner for the City and County of Honolulu, performed the autopsy on Wilhelm's body. The external examination of the body disclosed two gunshot wounds. One entry wound was to the back of Wilhelm's left shoulder. This bullet perforated the upper part of the shoulder and exited from the left upper front of the shoulder. The other bullet went through Wilhelm's face and into his head and brain. The Doctor concluded that "[t]he cause of death was the gunshot wound to his head and brain."

After the State rested its case, defense counsel made motions for judgment of ac-

---

8. Sandra Roselani Muller testified in the prosecution's case-in-chief and was recalled by the defense.

quittal on the charges that Defendant did "intentionally, knowingly or recklessly carry or possess a loaded firearm" and that he committed terroristic threatening in the first degree. The court denied both motions.

At the end of the case, defense counsel did not make any motions for judgment of acquittal. Neither counsel had any objections to the reading of the jury instructions.

### III.

■ Defendant claims that the trial court erred by admitting the autopsy photographs, State's Exhibits 56 through 60, 63 and 64 into evidence. He asserts that the photographs were "cumulative and duplicative," "their probative value was minimal," and they "merely served to inflame the jury." ·We do not agree with Defendant's arguments.

Hawai'i Rules of Evidence (HRE) Rule 402 provides that "[a]ll relevant evidence" defined by HRE Rule 401 [9] "is admissible, except as otherwise provided by the Constitutions of the United States and the State of Hawaii [Hawai'i], by statute, by these rules [of evidence], or by other rules adopted by the supreme court." HRE Rule 403 sets forth the following:

> **Rule 403 Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair . prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

"The responsibility for maintaining the delicate balance between probative value and prejudicial effect lies largely within the discretion of the trial court." *State v. Iaukea,* 56 Haw. 343, 349, 537 P.2d 724, 729 (1975) (citations omitted). Moreover, the "admission or rejection of photographs is a matter

within the discretion of the trial court; consequently, unless there is a showing of an abuse of discretion, the trial court's ruling will not be disturbed on appeal." *State v. Edwards,* 81 Hawai'i 293, 297, 916 P.2d 703, 707 (1996).

■ The Hawai'i Supreme Court has addressed the issue of the court's discretionary authority to admit or exclude photographs. In *State v. Apao,* the supreme court set forth the following test: "The test determining whether photographs may be shown to the jury is not whether they are necessary, but whether their probative value outweighs their possible prejudicial effect." *State v. Apao,* 59 Haw. 625, 639, 586 P.2d 250, 260 (1978) (citations omitted), *motion to amend denied,* 693 P.2d 405 (1984). The supreme court upheld the admission of three photographs of the deceased victim, stating that "the photographs had significant probative value in establishing the identity of the victim." *Id.* The *Apao* court stated that it found

> very little in the[ ] photographs that would tend to inflame the prejudices of the jury. Of the two in color, one shows the victim's body lying in some grass with a red patch of what could be blood near his hairline. The close-up shows the victim's facial injuries clearly, and although badly beaten, the victim's face is not gruesome. The third photo does depict a deep gash on the back of the victim's head, but this photograph is in black and white and we do not consider it gruesome either.

*Id.* at 640, 586 P.2d at 260.

This court followed the *Apao* test in upholding the admissibility of photographs of a murdered victim's decomposed body including "the display of his skull." *State v. Ahlo,* 2 Haw.App. 462, 467, 634 P.2d 421, 425 (1981), *cert. denied,* 456 U.S. 981, 102 S.Ct. 2252, 72 L.Ed.2d 858 (1982). The *Ahlo* court reasoned that

> [t]he prosecution must prove every element of its case beyond a reasonable doubt

**9.** Hawai'i Rules of Evidence (HRE) Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

and accordingly, must prove the cause of the death and lay it at the door of the defendants.... Thus, the State was left in the position of showing what evidence on the cause of death was available to it under the circumstances.... [W]e are not disposed to second guess the trial judge, who saw and heard all of the evidence, in determining how far the State should be permitted to go in the area of photographs of the victim's body or other exhibits including the autopsy film and the display of his skull.

*Id.*

More recently, in *State v. Klafta*, 73 Haw. 109, 831 P.2d 512 (1992), the Hawai'i Supreme Court once again upheld the lower court's admission of photographs of the victim's condition when she was found. *Id.* at 115, 831 P.2d at 516. The victim in *Klafta* was an abandoned sixteen-month-old infant, found "lying face-down" on the bank of a lake, "dehydrated, dirty, with dirt in her mouth, numerous bruises, and infested with maggots which were eating her." *Id.* at 112, 831 P.2d at 514. Disagreeing with the appellant that the photographs of the victim were "unduly prejudicial," the supreme court indicated that

[t]he jury, in determining the issue of appellant's responsibility, as defined by the statute, was entitled to know [the victim's] condition by the persons who found her, by the doctors who then examined her, and by the expert on entomology to explain the time range and how the infestation developed. It is true that the evidence of maggot infestation is revolting to a person of ordinary sensibilities, but the testimony of even one witness as to [the victim's] condition, when found, is just as revolting.

It is possible to conceive of a case where so much cumulative evidence is admitted that its total prejudicial effect demonstrates an abuse of discretion by the trial judge, but this is not such a case.... Rather [this] is a case where the prosecution properly painted a complete picture of [the victim] when found.

*Id.* at 115–16, 831 P.2d at 516.

With respect to the exhibits in question, defense counsel specifically stated at the July 12, 1994 hearing that there was "no objection" to Exhibit 56,[10] thereby waiving any right to object on appeal. *State v. Holbron*, 78 Hawai'i 422, 428–29, 895 P.2d 173, 179–80 (App.1995), *reconsideration denied*, 79 Hawai'i 424, 903 P.2d 729 (App.1995).

Exhibits 57–60,[11] and 63 [12] each show a different wound on the victim's body caused either by the shooting or the beating inflicted by Defendant and Jensen.

---

10. The following exchange took place regarding the admission of Exhibit 56.

> THE COURT: [Exhibit] 56.
> [DEFENSE COUNSEL]: Again, *on 56 we have no objection.*
> (Emphasis added.)

11. The court ruled on the admission of Exhibits 57–60 as follows:

> THE COURT: We're here addressing some memorandums [sic] regarding certain exhibits of the prosecution and objections thereto.
> We're going to go through by exhibit number and have each counsel state their position and the Court will rule.
> Exhibit Number 60, these are the autopsy records or photos.
> [DEFENSE COUNSEL]: Defense would object to the exhibit under Rule 403 and also as it being cumulative as we go through the rest.
> THE COURT: Very well, go ahead.
> [PROSECUTOR]: The photograph shows one of the injuries inflicted upon the decedent at the time of his beating is relevant to intent or knowledge, the state of mind of [Defendant] for the offense of murder, and he's being charged as an accomplice. There was an injury noted by the medical examiner and that is relevant.
> THE COURT: The Court finds that 60 is relevant and that—the probative value outweighs the danger by unfair prejudice or cumulativeness.
> 59. I think the first eight or so are all the autopsy.
> [DEFENSE COUNSEL]: Defendant will also object to 59 as being cumulative. It shows the head again and also it shows the second cut as Exhibit 60. It also shows the cut in Exhibit 60. I'll make it under Rule 403.
> [PROSECUTOR]: The State's position is this is relevant for the same reasons that 60 is relevant. This shows a separate and different laceration or abrasion to the head.
> THE COURT: Court finds the photograph to be relevant and not unfairly prejudicial. I'll accept it.

■ The record reflects that after incurring a gunshot wound to his left shoulder, Wilhelm was further beaten by Defendant who caused some of the wounds displayed in the exhibits. While not all the wounds visible in the exhibits were responsible for Wilhelm's death, they are relevant to Defendant's state of mind because he was charged with accomplice liability for second degree murder. Consequently, Defendant's affirmative conduct towards the victim is essential evidence which would be relevant to the "intent or knowledge, the state of mind of [Defendant]."

> 58.
> [DEFENSE COUNSEL]: Defense would object to 58 as not being relevant and it's cumulative. We have testimony apparently from the medical examiner as to cause of death. This particular wound is not a cause of death.
> [PROSECUTOR]: The State's position is the gunshot wound to the left shoulder is relevant to the defendant's state of mind at the time that the decedent was killed and although the evidence will show another person pulled the trigger, the defendant did administer a beating to the defendant after his having suffered the gunshot wound to the left shoulder which was apparent to him at the time and therefore it is relevant.
> THE COURT: Court finds it relevant and not unduly prejudicial.
> 57.
> [DEFENSE COUNSEL]: 57, your Honor, is another photograph, identical photograph of the same head. It's the third photograph of the head showing two cuts on the head. It's certainly cumulative and shows the same thing as the other two photographs being I guess 60 and 59—yeah, 60 and 59.
> [PROSECUTOR]: The State's position is that this exhibit is relevant. It shows a separate and different laceration or abrasion or injury to the head of the decedent, separate and different from the previous two photographs of head injuries having been inflicted by the beating administered by the defendant and the other co-responsible immediately prior to his death.
> THE COURT: Court finds the photograph is relevant and its probative value substantially outweighs any danger of unfairness and confusion.

12. Exhibit 63 was admitted as follows:

> [DEFENSE COUNSEL]: 63, your Honor, is yet another head shot showing both abrasions and a gapping [sic] wound to the side of the head. Again, it's cumulative, your Honor.
> [PROSECUTOR]: Your Honor, the photograph is relevant. Lay witnesses will testify

■ Exhibit 64 is an autopsy photograph "where the medical examiner is showing a three-foot iron rod through [Wilhelm's] thumb and into his brain."[13] This exhibit is relevant because it is a depiction of the bullet's trajectory "in the final position of the decedent immediately prior to his having been shot."

Upon reviewing the record before us, we conclude that the admitted autopsy photographs were not cumulative, nor was the probative value of the pictures substantially outweighed by the danger of unfair preju-

that they witnessed the decedent having been beaten, including by the defendant and that contact was made with the bat or club like object wielded [sic] by the defendant and the head and body of Nelson Wilhelm immediately prior to his having been shot by T.J. Jensen. This photograph fairly and accurately depicts the injuries to Nelson Wilhelm's face and the medical examiner's testimony will also substantiate the injuries seen on this exhibit are consistent with having been—with the decedent having been stuck by a blunt object and the photograph is therefore relevant.

> THE COURT: The court finds the photograph is relevant to show the things indicated by the prosecutor and in any event the probative value substantially outweighs any unfair confusion or cumulativeness. I'll accept it.

13. The objection to Exhibit 64 was rejected in the following manner:

> [DEFENSE COUNSEL]: 64 is an extremely gruesome photograph at the autopsy where the medical examiner is showing a three foot iron rod through [Wilhelm's] thumb and into his brain. Again, it's Rule 403 objection, your Honor. Again, for the record, [Defendant] was not in the area when the shot was inflicted. It's not relevant to the case and it's very gruesome.
> [PROSECUTOR]: This photograph is relevant because it shows the trajectory of the bullet in the final position of the decedent immediately prior to his having been shot, notwithstanding what defendant alleges his distance from the shooter at the time of the shooting. The defendant is being charged as an accomplice here and we don't have to show that he pulled the trigger.
> This would also be relevant in the event of any self-defense type of claim by Jensen or [Defendant].
> . . . .
> THE COURT: The Court finds the photograph to be relevant and its probative value outweighs any danger of unfair prejudice and cumulative evidence. So we'll accept 64.

dice. HRE Rule 403; *State v. Apao, supra.* Because "[t]he prosecution must prove every element of its case beyond a reasonable doubt," *Ahlo,* 2 Haw.App. at 467, 634 P.2d at 425, we believe that the photographs submitted "properly painted a complete picture of [the victim] when found." *Klafta,* 73 Haw. at 116, 831 P.2d at 516.

Therefore, we hold that the trial court did not abuse its discretion in admitting the photographs.

### IV.

Defendant next argues that there was insufficient evidence adduced at trial to prove that he possessed the intent to kill Wilhelm. Furthermore, he maintains that his counsel's failure to move for judgment of acquittal on the second degree murder charge constituted ineffective assistance of counsel.

### A.

█ Specifically, Defendant maintains that the prosecution failed to present enough evidence to prove beyond a reasonable doubt that he "intentionally or knowingly" caused the death of Wilhelm pursuant to HRS § 707–701.5.

The Hawai'i Supreme Court has

long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. . . .

"Substantial evidence" as to every material element of the offense charged is cred-

ible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion.

*State v. Jackson,* 81 Hawai'i 39, 46, 912 P.2d 71, 78 (1996) (quoting *State v. Pone,* 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995)).

█ However, with regard to accomplice liability for second degree murder, it is not necessary for the State to prove that the defendant "intentionally or knowingly" caused the death of another. Rather, under HRS § 702–222, the accomplice liability statute, the State is required to prove beyond a reasonable doubt that with regard to his or her state of mind, the defendant had the intent to "promote or facilitate" the commission of second degree murder.[14]

HRS § 702–221(2)(c) imposes liability on a person for the conduct of another if "he is an accomplice of such other person in the commission of the offense." HRS § 702–222 sets forth the following definition of accomplice:

A person is an accomplice of another person in the commission of an offense if:

(1) With the *intention of promoting or facilitating* the commission of an offense, the person:

 (a) Solicits the other person to commit it; or

 (b) Aids or agrees or attempts to aid the other person in planning or committing it; or

 (c) Having a legal duty to prevent the commission of the offense, fails to make reasonable effort so to do; or

(2) The person's conduct is expressly declared by law to establish the person's complicity.

(Emphasis added.)

"It is an elementary principle of law that intent may be proved by circumstantial evi-

---

**14.** The indictment charged Defendant as a principal with Jensen in causing Wilhelm's death. Although Defendant was not specifically charged as an accomplice, this does not prevent the prosecution from proceeding under an accomplice theory. *State v. Rullman,* 78 Hawai'i 488, 490, 896 P.2d 944, 946 (App.1995) ("State was not barred from arguing accomplice liability because a person named as a principal in an indictment can be convicted as an accomplice even without the State articulating separate accomplice allegations in the indictment.") (citations omitted).

dence[.]" *State v. Yabusaki*, 58 Haw. 404, 409, 570 P.2d 844, 847 (1977) (citations omitted). Moreover, "[t]he mind of an alleged offender may be read from his acts, conduct, and inferences fairly drawn from all the circumstances." *Id.*

We believe that the State presented sufficient evidence to have enabled the jury to conclude beyond a reasonable doubt that Defendant had the intent to "promote or facilitate" second degree murder. Defendant provided the money to purchase the rifle. He drove with Jensen to pick it up. Defendant accompanied Jensen, who carried the rifle, to the Gleasons' camp. Defendant armed himself with a club. Christine testified that it was Defendant who appeared in control of the situation. Defendant reportedly told Christine that "if [she] didn't want to die like [her] husband to tell [the Defendant] where his weed was." After Jensen fired the first shot at Wilhelm, Defendant pursued the wounded Wilhelm, found him in the bushes, dragged him out, beat him, and directed Jensen to Wilhelm. Jensen testified that he was with Defendant both before and after the shooting and that Defendant helped him hide the rifle.

Thus, considering the facts in the strongest light for the prosecution, we hold that the evidence was "of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion" that Defendant intended to promote or facilitate the commission of second degree murder. *State v. Lubong*, 77 Hawai'i 429, 432, 886 P.2d 766, 769 (App.1994).

### B.

Defendant also argues that he was denied effective assistance of counsel because his counsel did not move for judgment of acquittal on the second degree murder charge either before or after the case was submitted to the jury.

■ Normally, a Hawai'i Rules of Penal Procedure (HRPP) Rule 40 hearing is the proper vehicle for ineffective assistance of counsel claims. However, we believe that where the record on a direct appeal of a criminal conviction amply demonstrates the infirmity of a claim of ineffective assistance of counsel, the appellate court may dispose of the claim, thus avoiding the unnecessary delay and expense that would be engendered by subsequent HRPP Rule 40 proceedings. *Cf. State v. Silva*, 75 Haw. 419, 438–39, 864 P.2d 583, 592 (1993) (citation omitted) ("[I]n some instances, [an] ineffective assistance of counsel [claim] may be so obvious from the record that a Rule 40 proceeding would serve no purpose except to delay the inevitable and expend resources unnecessarily.")

"In assessing claims of ineffective assistance of counsel, the applicable standard is whether, 'viewed as a whole, the assistance provided was within the range of competence demanded of attorneys in criminal cases.'" *Dan v. State*, 76 Hawai'i 423, 427, 879 P.2d 528, 532 (1994) (quoting *State v. Antone*, 62 Haw. 346, 348, 615 P.2d 101, 104 (1980) (citation omitted)); *Jones v. State*, 79 Hawai'i 330, 334, 902 P.2d 965, 969 (1995). The defendant bears the burden "to demonstrate that, in light of all the circumstances, counsel's performance was not objectively reasonable...." *State v. Reed*, 77 Hawai'i 72, 83, 881 P.2d 1218, 1229 (1994) (citation and quotation marks omitted). To meet this burden, the defendant must show: "1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." *Id.* at 83, 881 P.2d at 1229 (quoting *Domingo v. State*, 76 Hawai'i 237, 241, 873 P.2d 775, 779 (1994)).

In light of our holding that there was sufficient evidence to convict Defendant as an accomplice to second degree murder, a motion for judgment of acquittal on this charge would not have succeeded. Therefore, defense counsel's failure to make a motion for judgment of acquittal did not rise to an error that resulted in either the withdrawal or substantial impairment of a potentially meritorious defense. Accordingly, we deny De-

fendant's ineffective assistance of counsel claim in this respect with prejudice.

## V.

Defendant asserts that the lower court erred when it imposed a mandatory minimum sentence of twenty years imprisonment pursuant to HRS § 706–660.1(3)(a) (1993).

### A.

■ HRS § 706–660.1 (1993) sets forth an additional "[s]entence of imprisonment for use of a firearm, semiautomatic firearm, or automatic firearm in a felony." Subsection (3)(a) states:

> (3) *A person convicted of a felony, where the person had a semiautomatic firearm or automatic firearm in the person's possession or used [it] or threatened its use while engaged in the commission of the felony,* whether the semiautomatic firearm or automatic firearm was loaded or not, and whether operable or not, *shall* in addition to the indeterminate term of imprisonment provided for the grade of offense be sentenced to a mandatory minimum term of imprisonment without possibility of parole or probation the length of which shall be as follows:

> (a) For murder in the second degree and attempted murder in the second degree—twenty years[.]

(Emphases added.)

In contrast to subsection (3)(a), subsection (1)(a) of HRS § 706–660.1 states:

> (1) *A person convicted of a felony, where the person had a firearm in the person's possession or threatened its use or used the firearm while engaged in the commission of the felony,* whether the firearm was loaded or not, and whether operable or not, *may* in addition to the indeterminate term of imprisonment provided for the grade of offense be sentenced to a mandatory minimum term of imprisonment without possibility of parole or probation the length of which shall be as follows:

> (a) For murder in the second degree and attempted murder in the second degree—up to fifteen years[.]

(Emphases added.)

When construing a statute, "our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *State v. Wells,* 78 Hawai'i 373, 376, 894 P.2d 70, 73 (1995) (internal quotation marks and citation omitted), *reconsideration denied,* 78 Hawai'i 474, 896 P.2d 930 (1995).

■ The word "shall" is generally considered mandatory. *In re Fasi,* 63 Haw. 624, 626, 634 P.2d 98, 101 (1981); *Black's Law Dictionary* 1375 (6th ed. 1990) ("As used in *statutes,* contracts, or the like, this word is generally imperative or mandatory.... The word in ordinary usage means 'must' and is inconsistent with a concept of discretion.") (emphasis added); *Merriam–Webster's Collegiate Dictionary* 1075–76 (10th ed. 1993) ("used in laws, regulations, or directives to express what is mandatory").

■ Also, when a statute contains both mandatory and directory verbs such as "shall" and "may" in close juxtaposition, the court is to infer that the legislature intended that the verbs should carry with them their ordinary meanings. *Fasi,* 63 Haw. at 626–27, 634 P.2d at 101. Hence, the statutory language indicates that under HRS § 706–660.1(3)(a) the sentencing court is required to impose the mandatory minimum sentence, while under HRS § 706–660.1(1)(a), the sentencing court retains discretion on whether or not to impose the mandatory minimum sentence specified.

This construction of HRS § 706–660.1(3)(a) is confirmed by legislative history. "[I]n determining the purpose of the statute, we are not limited to the words of the statute to discern the underlying policy which the legislature seeks to promulgate but may look to relevant legislative history." *Wells,* 78 Hawai'i at 376, 894 P.2d at 73 (citations, quota-

tion marks, brackets, and ellipsis points omitted). Subsection (3) was added to HRS § 706–660.1 in 1990.[15] The Senate Judiciary Committee Report concerning that section states:

Your Committee has addressed the very real concern within the community regarding the use by criminals of semiautomatic "assault" weapons. To that end, your Committee has amended the bill by adding a new subsection to Section 706–660.1, Hawaii [Hawai'i] Revised Statutes, to provide for severe mandatory minimum sentences for the use of these weapons in the commission of a felony. Under current law a first "firearm felony" offender may be sentenced to a minimum term of up to 15 years while a second "firearm felony" offender must be sentenced to a mandatory minimum term of up to 20 years. *This bill would require that a first semi-automatic or automatic "firearm felony" offender be sentenced to a mandatory minimum term of up to 20 years.* Your Committee believes that these harsh sentences are necessary to keep these weapons out of the hands of criminals.

Sen.Stand.Comm.Rep. No. 3058, in 1990 Senate Journal, at 1243 (emphasis added).

Accordingly, we hold that the sentencing court must impose the mandatory minimum term of imprisonment specified under HRS § 706–660.1(3) upon the filing of an appropriate motion[16] and a finding that a defendant "had a semiautomatic firearm or automatic firearm in [his or her] possession or used or threatened its use while engaged in the commission of the felony[.]"

### B.

 Next, we must determine whether the sentencing court properly applied HRS § 706–660.1(3).

Defendant argued at his sentencing hearing that HRS § 706–660.1(3) did not apply "because he never possessed, used or threatened [sic] to use a firearm in the commission of the shooting[.]" The State contended that the court "had no choice but to invoke the mandatory minimum [sentence under HRS § 706–660.1(3) ] because [Defendant] was convicted as though he was [a] principal." The sentencing court imposed the mandatory minimum twenty-year term pursuant to HRS § 706–660.1(3) because "there was the use of the semi-automatic weapon in connection with the murder."

To the extent that Defendant claims he is not subject to the enhanced sentence of HRS § 706–660.1(3) based solely upon his criminal liability as an accomplice, we agree.

The Hawai'i Supreme Court has held that accomplice liability alone cannot be the basis for the enhanced sentence of HRS § 706–660.1(1) where the accomplice defendant did not "personally possess, threaten to use, or use a firearm while engaged in the commission of [a] felony." *Garringer v. State,* 80 Hawai'i 327, 334, 909 P.2d 1142, 1149 (1996).

The supreme court stated that although the "theory of accomplice liability applies where the use or possession of a firearm is an element of the offense or a separate offense even though the defendant did not engage in the requisite conduct[,]" the theory is inapplicable when determining liability "for the mandatory penalties within the scope of HRS § 706–660.1." *Id.* at 332–33, 909 P.2d 1147–48. The supreme court adopted the rationale that "for sentencing purposes there might be a reason to treat a defendant more severely who personally uses a gun" as compared to an accomplice who "could very well have a lesser level of responsibility." *Id.* at 333, 909 P.2d at 1148 (quoting *Dailey v. State,* 675 P.2d 657, 658–59 (Alaska App. 1984) (quotation marks omitted)).

Other than the mandatory nature of the sentence where a semi-automatic firearm is

---

**15.** Act 57, Hawai'i Session Laws 1992, amended HRS § 706–660.1 to conform subsection and paragraph designations to the style used in the Hawai'i Penal Code, HRS Title 37. Therefore, what was added in 1990 as subsection (c) was altered to subsection (3).

**16.** *See State v. Schroeder,* 76 Hawai'i 517, 532, 880 P.2d 192, 207 (1994) (holding it is incumbent on the State to move for the imposition of mandatory minimum terms of imprisonment in order to provide the defendant adequate notice).

involved, the language of HRS § 706–660.1(3) does not differ in any material way from that of HRS § 706–660.1(1). Therefore, as under HRS § 706–660.1(1), we hold that the mandatory minimum term of imprisonment set forth in HRS § 706–660.1(3) cannot be imposed on a defendant who did not personally possess, use or threaten to use a semi-automatic or automatic firearm, simply on the basis of his or her accomplice liability.

The imposition of the mandatory minimum term under HRS § 706–660.1(3) requires "the necessary finding that [the defendant] actually or constructively possessed [used, or threatened the use of the prohibited firearm] during the [attendant felony]." *Id.* at 334, 909 P.2d at 1149. Such a finding is not an "historical fact" which may be made by the sentencing court but encompasses "aggravating circumstances ... intrinsic to the commission of the crime charged [and therefore] must be determined by the trier of fact." *Id.* at 334, 909 P.2d at 1149.

Hence, the Hawai'i Supreme Court in *Garringer* directed that in similar future cases "the circuit court should instruct the jury, by special verdict interrogatories, to make any and all findings relevant to the imposition of enhanced sentences where the requisite aggravating circumstances are intrinsic to the commission of the crime charged." *Id.* at 335, 909 P.2d at 1150. The circuit court in the instant case did not have the benefit of this mandate.

Consequently, we, following the procedure adopted by the supreme court in *Garringer,*

> withhold judgment on [Defendant's] conviction of [Count VI (second degree murder)] for thirty days. If the prosecution within that time consents to resentencing without a mandatory minimum under HRS § 706–660.1, we will affirm the conviction on that count and remand for resentencing. If, on the other hand, the government does not consent, we will vacate [Defendant's] conviction on [Count VI] and remand for a new trial.

*Id.*

### VI.

Defendant asserts that the court's imposition of a mandatory minimum sentence under HRS § 706–660.1(3) violated his constitutional right to "equal protection of the laws" because he was "singled out for disproportionate punishment." Essentially, Defendant contends that it was unfair to sentence him to an additional mandatory minimum prison term of twenty years for the use of a firearm in Wilhelm's murder and not sentence Jensen, who actually shot and killed Wilhelm, to the same sentence.

In light of our holding above, unless the State decides to retry the Defendant and meets its burden of proof with regard to Defendant's possession, use, or threatened use of a semi-automatic firearm, Defendant's equal protection argument is inapplicable. Consequently, it is not necessary for us to address Defendant's equal protection argument at this time.

### VII.

We affirm the November 4, 1994 judgment of convictions except we withhold the judgment on Defendant's second degree murder conviction for thirty days from the filing date of this opinion. If the prosecution within that time consents to resentencing without the mandatory minimum sentence under HRS § 706–660.1(3)(a), we will affirm the conviction on that charge and remand for resentencing. If, on the other hand, the State does not consent, we will vacate Defendant's conviction on the second degree murder charge and remand for a new trial on that charge. The State shall make known its choice between the aforesaid alternatives by filing an appropriate notice with this court and by serving a copy thereof on counsel for Defendant.