**STATE OF HAWAII**, Plaintiff–Appellee, v. **SHARON ANNE KLAFTA**, Defendant–Appellant

NO. 15233

(FC–CR. NO. 90–0012)

MARCH 27, 1992

LUM, C.J., PADGETT, HAYASHI, WAKATSUKI, AND MOON, JJ.

OPINION OF THE COURT BY PADGETT, J.

Appellant was convicted of attempted second degree murder in violation of HRS §§ 705–500 and 707–701.5(1). We affirm.

The indictment read:

On or about the 16th day of April, 1990, to and including the 21st day of April, 1990, in the City and County of Honolulu, State of Hawaii, SHARON ANN [sic] KLAFTA, being the parent, guardian, or any other

person having legal or physical custody of Heather Klafta, a person less than 18 years of age, did intentionally engage in conduct which is a substantial step in a course of conduct intended or known to cause the death of Heather Klafta, thereby committing the offense of Attempted Murder in the Second Degree, in violation of Sections 705–500, 707–701.5(1) and 706–656 [sic] of the Hawaii Revised Statutes.

HRS § 707–701.5(1) provides:

Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

HRS § 705–500 provides:

**Criminal attempt.** (1)  A person is guilty of an attempt to commit a crime if he:

(a)  Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or

(b)  Intentionally engages in conduct which, under the circumstances as he believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his commission of the crime.

(2)  When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, he intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

(3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

Sometime after noon on Saturday, April 21, 1990, Heather Klafta, an infant, some 16 months old, was found lying face–down on the steep bank of Lake Wilson, dehydrated, dirty, with dirt in her mouth, numerous bruises, and infested with maggots which were eating her. When the police were able to find out who she probably was, they went to the nearby home of appellant, her mother, to inquire. The divorced father, who was there, informed them that the appellant had told him that Heather had been taken away by the social services, and the appellant said that Heather had been kidnapped on the previous Thursday, the 19th, by two black men.

It subsequently developed that Heather had in fact been abandoned by the appellant about 2:00 a.m. on April 20th on a dirt mound between a road and the Wahiawa Reservoir. A 6–year–old sister was a witness to the abandonment, and had attempted unsuccessfully to get her mother to go back for the child the next day. Appellant told the sister to say that she, appellant, had given the child away to a social worker and later told the sister to say that Heather had been kidnapped. When the ex–husband and father of Heather returned to the Wahiawa apartment of appellant on the evening of the 20th, appellant told him Heather had been taken away by social services. Although there was a medical opinion that Heather would not have survived another 24 hours, exposed as she was, she recovered, and appellant was subsequently indicted, and ultimately convicted, for attempted murder in the second degree.

At trial, the State elicited testimony from six neighbors who had observed Heather's physical condition in the days preceding the abandonment, had observed appellant with Heather, and some

of whom had observed appellant after the abandonment, and before Heather was found.

The State also produced several witnesses who were involved in finding Heather on the steep embankment next to the reservoir, and observed her condition at that time. Two of these people were police officers, one of whom recovered maggots from Heather's diaper, put them in a preservative container and turned them over to the entomologist who testified. In addition, the State produced another officer who went over the area the day following, and observed a mongoose some 50 feet from where Heather was found.

The State also produced the evidence of Dr. Craig Thomas, the emergency room physician who first treated Heather at the Wahiawa General Hospital; the testimony of Dr. Frederick Burkle, Jr., the physician who treated Heather at Kapiolani Hospital, when she was transferred there following the emergency treatment at Wahiawa General; and Dr. Goff, an entomologist who explained the life cycle of the maggots found on Heather and their significance with respect to the time frame.

In addition, the State produced photographs of Heather in the condition in which she was found.

At trial, appellant objected to all of this testimony as being irrelevant and prejudicial. She also objected to exhibits 8, 9, 10, 11, 15, and 16; the testimony of Dr. Thomas; and the testimony of the neighbors Troutman, Perry, Villanueva, Casas, and Galban as cumulative, in addition to being irrelevant and prejudicial. The Hawaii Rules of Evidence (HRE) provide as follows:

> **Rule 401 Definition of "relevant evidence".**
> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
>
> **Rule 402 Relevant evidence generally admissible; irrelevant evidence inadmissible.** All relevant

evidence is admissible, except as otherwise provided by the Constitutions of the United States and the State of Hawaii, by statute, by these rules, or by other rules adopted by the supreme court. Evidence which is not relevant is not admissible.

**Rule 403   Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The principal trial issue in this case was the appellant's intent in abandoning Heather and leaving her abandoned until she was finally found. Framed in the statutory language, did appellant, by abandoning Heather, intentionally engage in conduct which was a substantial step in a course of conduct intended or known by her to be such as to cause Heather's death.

The evidence of Heather's physical condition in the days immediately preceding the abandonment, appellant's conduct toward her, where and when Heather was found, her condition at that time, and the period during which she had been abandoned were all evidence which had the tendency to make the existence of the fact of intention to cause Heather's death more probable than it would have been without the evidence. Thus, all of that evidence was relevant under HRE 401 and admissible under HRE 402.

The question then is whether the judge should have excluded some or all of it because of the danger of unfair prejudice or because it was a needless presentation of cumulative evidence.

As the Commentary to HRE 403 notes, we said in *State v. Iaukea*, 56 Haw. 343, 349, 537 P.2d 724, 729 (1975):

The responsibility for maintaining the delicate balance between probative value and prejudicial effect lies largely within the discretion of the trial court.

Dealing first with the claims of error in receiving cumulative evidence, that objection was raised with respect to the testimony of Dr. Thomas, the emergency room physician at Wahiawa General Hospital to which Heather was taken when found. Presumably, appellant's objection is that both he and Dr. Burkle, the physician who examined Heather when she was then transferred to Kapiolani Hospital, observed many of the same things. Nevertheless we do not see how Dr. Thomas' testimony could be considered cumulative.

The cumulative objection was also made with respect to exhibits 8, 9, 10, 11, 15, and 16, photographs of Heather's condition when she was found. We see no abuse of discretion in admitting those photographs. *Cf. Robinson v. State*, 342 So. 2d 1331 (Ala. Crim. App. 1977).

As to the testimony of five of the neighbors objected to as being cumulative, they each observed many of the same things, but they also observed some things which were different and, again, we find no abuse of discretion in the admission of their testimony.

As to the contention, strongly urged by appellant, that the photographs, exhibits and testimony with respect to the maggot infestation of Heather was unduly prejudicial, we again see no abuse of discretion. Probative evidence always "prejudices" the party against whom it is offered since it tends to prove the case against that person.

The jury, in determining the issue of appellant's responsibility, as defined by the statute, was entitled to know Heather's condition by the persons who found her, by the doctors who then examined her, and by an expert on entomology to explain the time-range and how the infestation developed. It is true that the evidence of maggot infestation is revolting to a person of ordinary

sensibilities, but the testimony of even one witness as to Heather's condition, when found, is just as revolting.

It is possible to conceive of a case where so much cumulative evidence is admitted that its total prejudicial effect demonstrates an abuse of discretion by the trial judge, but this is not such a case. This is not a situation where the prosecution was piling Pelion on Ossa. Rather it is a case where the prosecution properly painted a complete picture of Heather when found. As we have said, the evidence was relevant, and the trial judge's determination that, in the circumstances of this case, it was not unduly prejudicial was not an abuse of discretion.

Appellant also contends that the court erred in excluding certain testimony by the defense expert, Dr. Cooper. Appellant's counsel's offer of proof at trial was:

It would be speaking to the intent of the defendant in this case, his opinion as to her intent from the information given to him by her and others, her intent was to just leave the child for it to be found and including not to kill the child as in an attempted murder cause of action.

After a further exchange between court and counsel, appellant's counsel ended by saying:

Well, Your Honor, again, we're not arguing no[t] guilty by reason of insanity but rather just opinion as to intent which we believe is different. We believe Chapter 704, that the mental responsibility is different from Rule 704, allowing us to go to the particular state of mind. That is the objection we would like to place on the record.

Had appellant been offering to prove, by the testimony of Dr. Cooper, that because of a physical or emotional disease, disorder or defect, she was incapable of forming the intent to murder Heather, then the court, under HRS § 704–404, would have suspended the trial, either discharged or not discharged the jury in its

discretion, and required a mental examination as outlined in that section. But appellant expressly was not raising such a defense.

HRS Chapter 704 is based on the Model Penal Code. As was noted in *State v. Dumlao*, 6 Haw. App. 173, 715 P.2d 822 (1986), the Model Penal Code does not recognize diminished capacity as a distinct category of mitigation nor does HRS Chapter 704.

Expert testimony about defendant being under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation is allowable, since such a disturbance can reduce a murder to manslaughter. HRS § 707–702(2). The judge below allowed such testimony by Dr. Cooper and instructed the jury properly on that matter.

Since appellant was not raising an insanity defense, since the law does not recognize a diminished capacity defense as such, and since the doctor was permitted to testify as to extreme mental or emotional disturbance, it is somewhat difficult to perceive what appellant's complaint is. Neither the brief, nor the answers given at oral argument, shed any real light on the matter. If, as counsel at trial represented, what was wanted was to have Dr. Cooper testify as to appellant's intent, based upon his interviews with her and others, such testimony, in effect, would be testimony upon her credibility, an issue upon which expert testimony is not admissible, and is of no help to the jury. *See State v. Batangan*, 71 Haw. 552, 799 P.2d 48 (1990). We find no error in the rejection of Dr. Cooper's proposed testimony.

Appellant also contends that the court below erred in instructing the jury:

> The defendant is charged with the offense of Attempted Murder in the Second Degree. Only when one or more jurors are not convinced beyond a reasonable doubt that the defendant is guilty of Attempted Murder in the Second Degree can you decide whether you are

convinced beyond a reasonable doubt whether the defendant is guilty of a lesser included offense.

We find no error in this instruction. *See State v. Horn*, 8 Haw. App. 167, 796 P.2d 503 (1990).

Appellant's next contention is that the court below should have granted a mistrial for juror misconduct, or at least erred in not further questioning the jurors with regard thereto.

Appellant's opening brief contains a misstatement of the evidence on this matter. At page 33, appellant states: "The court bailiff discovered a dictionary in the jury room[.]" The transcript reveals the following:

MR. OAKES [appellant's counsel]: I agree with what Jennifer said with regards to instructions to the jury. I would also at this time move for a mistrial, based on the fact that the dictionary was found within the jury room, when they were not suppose [sic] to have anything of that nature.

THE BAILIFF: The dictionary was outside in the hall.

MR. OAKES: Oh, okay.

The evidence on the subject matter of the dictionary in this case, as it appears from the transcript is as follows. On Tuesday morning, September 25, 1990, the bailiff, in the hallway, took from juror Mau a copy of Black's Law Dictionary before Mau entered the jury room.

Although the transcript is dated "Honolulu, Hawaii, Monday, September 24, 1990, at 9:00 A.M.," it is obvious that the actual event, and the proceedings which followed, took place on the morning of September 25, 1990, and that the court, upon being informed of the dictionary matter, immediately called counsel by telephone. Appellant's counsel had a hearing commencing at 8:30, and could not immediately come to court. The prosecutor could come right down. The court proposed to call in the juror who

had brought the dictionary and question him immediately, but after discussion, appellant's counsel stated: "It might be better to wait until she comes down" and so the proceedings were continued until 10:00 a.m. when counsel were present. At 10:00 a.m. there was a discussion with respect to Mr. Moore, a juror who had been excused the previous day, and then the jury was called in. Juror Mau was called forward to the bench and asked whether any of the other jurors saw the dictionary. He stated that Morishige and Vincent had been shown the dictionary in the hallway. He was told he had to follow the instructions of the court, said he could still do that, and was specifically asked whether he looked up anything in the dictionary. He said he looked up "intent" and "malice." He was asked by appellant's counsel:

Okay. Did anything you looked up — Was it different from what the Judge instructed you?

MR. MAU:  No.

MR. OAKES:   So by looking up the words malice and intent, wouldn't it influence you one way or the other?

MR. MAU:  No.

THE COURT:   Any more questions?

MS. CHING:   No.

MR. OAKES:   No.

Morishige was then specifically instructed he couldn't look at the dictionary, was questioned by appellant's counsel, and said he looked up one word "murder" but after reading the definition, he didn't know what it meant, that it was very difficult to understand and that it would not influence him. Vincent was then instructed she couldn't use the dictionary, stated that she could base her decision only on the instructions, and said she was just looking at words but that they didn't refer to anything and that she could base her decision on the evidence given the court.

Appellant's counsel then reasserted his motion for a mistrial because Mau had looked up "intent" and "malice" and because Morishige had looked up the word "murder." The court denied the motion for mistrial, and instructed the jury that they couldn't look at dictionaries and that the three jurors who may have had access to the dictionary could not discuss with the other jurors anything they saw in the dictionary.

The following morning at 8:30 a.m., in chambers, the court informed counsel that, in looking through the dictionary, the bailiff had come across two charge card receipts in the name of John Moore, the juror who had been excused. The court suggested that before the jury resumed its deliberations, at least juror Mau be invited in to chambers on the record and questioned. He was. On questioning, he said he had gotten the dictionary from Moore on Friday, but subsequently changed that testimony to Monday, which would have been the 24th, before court, and before Moore had been excused as a juror. He got it from Moore at Restaurant Row where they were sitting, and that he put it in his car at that time. Moore said nothing to him when he gave him the dictionary, and he got it by just asking if he could see it, and look through it. On Tuesday morning, he brought it with him because he said he was going to ask the bailiff if he could bring it in the deliberation room. He said that Morishige and Vincent saw the dictionary about 7:30 that morning while sitting at Restaurant Row. Moore was not present but Dale Spaulding was present along with Morishige and Vincent. The judge inquired about underlined markings in the book and corners of pages turned down. Mau said the markings were his and that he had looked up the words at home on Monday, after the law had been read by the jurors during deliberations. (A copy of the instructions had been sent to the jury room.) He said that the reason the jurors were present at Restaurant Row was that they were having coffee before court, that he had laid the book down on the table, and that Vincent and Morishige had

thumbed through it at that time. He said he never said anything about the book in the deliberations, and that he was able to base his decision on the evidence and the testimony. He further said that he couldn't remember what the meanings in the book were, and he wouldn't base his decision on them. The prosecutor then suggested that juror Spaulding be called in. Spaulding said he had seen the book at Restaurant Row but knew better than to look at it.

At no time did appellant's counsel suggest that further questioning of other jurors would be appropriate, nor was the lack of further questioning of other jurors made a basis for the numerous motions for mistrial which appellant's counsel made during the proceedings with respect to the dictionary.

In this case, there is no doubt that three of the jurors looked at Black's Law Dictionary between the time the case was submitted to the jurors and the verdict was reached. Thus, there was a rebuttable presumption of prejudice. *State v. Williamson*, 72 Haw. 97, 102, 807 P.2d 593, 596 (1991). As was stated in *Williamson*:

> The standard to be applied in overcoming such a presumption is that the outside influence on the jury must be proven harmless beyond a reasonable doubt.

*Id.*

In *Williamson*, the dictionary was discovered in the jury room after deliberations were concluded, and the appellant in his motion for a mistrial requested further probing as to who brought in the dictionary, what was said with respect thereto, etc. The trial court, however, expressly refused to question anyone other than the foreman about the dictionary and its use. Moreover, in *Williamson*, Webster's New Collegiate Dictionary was used and the definitions of "entrap" and "preponderance" were not the same as those in the court's instructions. Here, Mau testified that he looked in Black's Law Dictionary (we don't know which edition) for the definitions of "malice" and "intent," that they seemed the same as the court's instructions, and that at any rate, he could not remember what was

in the dictionary. We note that while "intent" was defined in the court's instructions in this case, "malice" was neither defined, nor used. Morishige testified that he looked up the definition of "murder" but could not understand it. Unlike *Williamson*, the dictionary in this case never made it to the jury room, so that eight jurors never even saw it.

The court acted promptly in bringing the matter to the attention of counsel, and in instructing the jury not to make reference to the dictionary nor to discuss it. All of the jurors who had seen the dictionary outside the courtroom were questioned as to what they had done, and had seen, and all stated they would not be influenced by the dictionary. Mau specifically stated that at no time in the deliberation room did he discuss what was in the dictionary with the other jurors. Thus, in our view, on the facts of this case, it is much closer to *State v. Amorin*, 58 Haw. 623, 574 P.2d 895 (1978), than to *Williamson*. As we said in *Williamson*:

> The function of the jury is to decide questions of fact while the trial court is the sole source of all definitions and statements of law applicable to an issue to be resolved by the jury. During the course of a trial, a juror's obtaining of extraneous definitions or statements of law differing from that intended by the court is misconduct which may result in prejudice to the defendant's constitutional right to a fair trial. *Amorin*, 58 Haw. 623, 574 P.2d 895 (1978). However, not all juror misconduct necessarily compels the granting of a new trial. A new trial will not be granted if it can be shown that the jury could not have been influenced by the alleged misconduct. *Id.*

> In *Amorin*, this court held that it was misconduct for a juror to consult three dictionaries for definitions of the term "insanity," defendant's sole defense in his trial for murder. In that case, the trial court's investigation was

not restricted to questioning the foreperson. The judge appropriately interrogated the offending juror extensively in order to elicit the "totality of circumstances" surrounding the juror's research efforts and its influence on him. Included within his explanation, the juror testified that during the deliberations the only definition he could remember from the dictionaries was the same as the court's instruction and therefore based his vote solely on the definition given by the court. The defendant was convicted and his motion for new trial based on jury taint was denied. On appeal this court found that the juror's testimony, coupled with the foreman's assurances, indicated that the jury was not influenced by extraneous definitions and held that the juror misconduct was harmless beyond a reasonable doubt.

72 Haw. at 103–04, 807 P.2d at 596–97.

The trial judge in this case was punctilious in investigating claims of misconduct. When it appeared that a juror had sent a note to a witness, the trial court not only questioned the juror, but also questioned the other jurors, individually, to see if they had noticed the matter, and ended by excusing the juror in question. When the matter of the dictionary came up, the trial court promptly questioned the jurors involved, and promptly and properly instructed the jury that they were not to consider the dictionary. When the bailiff's perusal of the dictionary raised a further question, the court promptly went into that too, and again questioned the juror involved at length and in depth. No request for further questioning was made by appellant's counsel, nor was the lack of further questioning made the basis of any motion for mistrial. In our view, given the testimony of the jurors involved, and the events involved, we think it was established beyond a reasonable doubt that the misconduct was harmless.

Appellant's final claim of error is that the court below acted illegally in sentencing her to life imprisonment with a mandatory minimum term of 15 years.

HRS § 706–660.2 provides:

**Sentence of imprisonment for offenses against children, elder persons, or handicapped persons.** Notwithstanding section 706–669, a person who, in the course of committing or attempting to commit a felony, causes the death or inflicts serious or substantial bodily injury upon a person who is:

(1)  Sixty years of age or older;

(2)  Blind, a paraplegic, or a quadriplegic; or

(3)  Eight years of age or younger;

and such disability is known or reasonably should be known to the defendant, shall, if not subjected to an extended term of imprisonment pursuant to section 706–662, be sentenced to a mandatory minimum term of imprisonment without possibility of parole as follows:

(1)  For murder in the second degree — fifteen years;

(2)  For a class A felony — six years, eight months;

(3)  For a class B felony — three years, four months;

(4)  For a class C felony — one year, eight months.

There is no doubt that appellant was convicted of attempted murder in the second degree with respect to a person under eight years of age.

Appellant argues however that there were no serious or substantial bodily injuries inflicted on Heather in the course of attempting to commit the offense. Appellant's argument is that her only act was leaving Heather on the mound of dirt, that she did not inflict on Heather the injuries she was suffering from when found, and she contends those injuries did not occur in the course of her conduct. We cannot agree.

Attempted murder of an infant by abandonment, in conditions which leave the infant in danger of death by reason of exposure or accident, is not completed when the infant is left. It is a course of conduct which continues as long as the infant is abandoned. We note that in this case, even the six–year–old sister urged her mother the next day to go back and get the infant, and that on Friday evening, when the father and ex–husband returned, the appellant lied to him as to what had become of the infant. Appellant's course of conduct inflicted the injuries which the infant suffered, and, taken together, they were undoubtedly serious bodily injuries.

Appellant also argues that HRS § 706–660.2 does not apply to attempted murder in the second degree. That argument is contrary to the plain reading of the statute.

Finally, she argues that the sentence is unconstitutional because it is cruel and unusual and provides for no discretion on the part of the judge. A life sentence with a mandatory minimum of 15 years for the attempted murder, by abandonment, of a 15–month–old child does not seem to us either cruel, or unusual, and we think it well within the province of the legislature to impose such a penalty, without giving discretion to the court to vary therefrom. Affirmed.

*Joyce K. Matsumori–Hoshijo (Theodore Y.H. Chinn* with her on the opening brief), Deputy Public Defenders, for appellant.

*Caroline M. Mee*, Deputy Prosecuting Attorney, for appellee.

## DISSENTING OPINION OF WAKATSUKI, J.

I respectfully dissent.

The admission of evidence regarding Heather Klafta's physical condition, specifically the maggot infestation of her vaginal

area, was needlessly cumulative and highly prejudicial, thereby denying Sharon Klafta a fair trial. Further, the trial court erroneously excluded testimony of Sharon Klafta's psychiatrist, Dr. Cooper, regarding whether or not she possessed the intent to kill at the time of abandonment.

Under Hawaii Rules of Evidence (HRE) Rule 403, "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, . . . *or* a needless presentation of cumulative evidence." (Emphasis added.)

The State made its case against Sharon Klafta by presenting evidence, which in the majority's own words was "revolting to a person of ordinary sensibilities." While evidence of Heather's physical condition, resulting from the environment in which she was abandoned, may have been relevant to show whether or not her mother intended to kill her by leaving her subject to such an environment, any probative value of the cumulativeness of the same evidence was substantially outweighed by the danger of unfair prejudice.

The graphic evidence of maggot infestation consisted of not just one color photograph, but several, depicting Heather's naked body eaten by the maggots. State's exhibit 9[1] displayed baby Heather Klafta lying on her back with her legs spread open to reveal the vaginal and inner buttock area filled with open red sores created by the maggots that burrowed into her flesh. State's exhibit 10 again showed baby Heather Klafta lying on her back with her lower vaginal area exposed to reveal the red craters in her flesh eaten by the maggots. State's exhibit 16 also shows the upper portion of baby Heather's vaginal area while she was lying down and partly turned on her side.

The State continued to offer evidence in this horrific manner with a slide show on the life cycle of a fly, presented by one of its

---

[1] The defendant also objected to State's exhibit 9 though the majority has not included this exhibit in its discussion.

experts. Projected onto a large screen before the jurors were color magnifications of the stages of the fly from a worm–like larva appearance to that of a fully mature fly. These slides also showed up–close the incisor like cutting edges in the mouth of the larva which it uses to burrow. Further, accompanying the slide show, the State introduced two vials of maggots and two slides containing maggots which were recovered from baby Heather Klafta.

In addition, the State's evidence regarding the maggot infestation included the detailed and largely repetitive accounts of the maggots in Heather's flesh by the two doctors, Dr. Craig Thomas and Dr. Frederick Burkle, Jr., who treated Heather. Further, each time one of these doctors testified the photographs of Heather's maggot eaten vaginal area were passed to the jury.

The unnecessary cumulativeness of this evidence also substantially prejudiced Sharon Klafta's right to a fair trial. The majority seems to rationalize that if the testimony by "even one witness as to Heather's condition, when found" is "revolting," then the effect of additional similar testimony combined with the graphic color photographs and enlarged pictures from the slide show, could not have heightened prejudice. However, upon repetition the very nature of this evidence increases, rather than decreases, the sensitivities of the jurors. Obviously, this kind of presentation, could have easily led the jurors to bypass the inquiry of whether or not Sharon Klafta intended to kill her child at the time of abandonment by improperly focusing instead on what actually happened to the child as evidence of Sharon's intent to kill.

The majority also holds that the trial court did not err in excluding part of the testimony of Sharon Klafta's psychiatrist, Dr. Cooper. The majority insists that such testimony regarding whether or not she possessed the requisite intent is only admissible under Hawaii Revised Statutes (HRS) § 704–404 when the defendant has alleged that a "physical or emotional disease, disorder or

defect, . . . [has made her] incapable of forming the intent to murder."

The majority further rejects this testimony on the basis that it falls into a "category of mitigation" known as "diminished capacity" which is not recognized in HRS Chapter 704. The majority relies on *State v. Dumlao*, 6 Haw. App. 173, 715 P.2d 822 (1986), for the proposition that the Model Penal Code, on which HRS Chapter 704 is based, does not describe diminished capacity as a "distinct category of mitigation." Yet, *Dumlao* also states:

> by placing more emphasis than does the common law on the actor's subjective mental state, [the Model Penal Code] also may allow inquiry into areas which have traditionally been treated as part of the law of diminished responsibility or the insanity defense.

*Id.* at 181, 715 P.2d at 828.

In addition, the analogy drawn by the majority between our HRS Chapter 704 and the Model Penal Code to support their analysis is not significant where the language of our own statutes is clear. As the majority admits Sharon Klafta "expressly was not raising such a defense" pursuant to HRS § 704–404. Rather, HRS § 704–401 is applicable. Under HRS § 704–401, Dr. Cooper should have been able to testify that Sharon Klafta did not intend to kill her child. HRS § 704–401 provides "[e]vidence that the defendant suffered from a physical or mental disease, disorder, or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind which is required to establish an element of the offense." The commentary to HRS § 704–401 states:

> This section accords to evidence of physical or mental disease, disorder, or defect its full evidentiary significance. It assures "admissibility [of such evidence] co–extensive with its relevancy to prove or disprove a material state of mind." . . . *Any evidence* relevant to

prove or disprove the requisite state of mind ought to be admissible. (Emphasis added.)

According to the majority, Sharon Klafta had no real "complaint" because Dr. Cooper did testify regarding her extreme mental or emotional disturbance and that, in any event, testimony regarding her intent would not be admissible as part of an expert opinion because it would be essentially "testimony on her credibility" due to the fact that it would be based on interviews. Although, Dr. Cooper may have explained the mental or emotional disturbance that Sharon Klafta suffered, this would have carried less weight in the minds of the jurors than the kind of expert opinion he offered to render on the crucial issue of her lack of intent to kill. Hawaii Rules of Evidence Rule 704 states "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

I would reverse the trial court's rulings and remand for a new trial.