107 P.3d 1190

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Randy H. KONOHIA, Defendant–Appellant.**

No. 25489.

Intermediate Court of Appeals of Hawai'i.

Feb. 9, 2005.

Certiorari Denied March 18, 2005.

Simone C. Polak, Deputy Prosecuting Attorney, County of Maui, on the briefs, for Plaintiff–Appellee.

Deborah L. Kim, Deputy Public Defender, on the briefs, for Defendant–Appellant.

WATANABE, Acting C.J., FOLEY and NAKAMURA, JJ.

Opinion of the Court by NAKAMURA, J.

Defendant–Appellant Randy H. Konohia (Konohia) appeals from the Judgment entered on September 26, 2002, by the Circuit Court of the Second Circuit (the circuit court).[1] The State of Hawai'i (the State) jointly charged Konohia and his cousins, Randall Konohia (Randall) and Boniface Konohia (Boniface), as principals and/or accomplices with 1) Attempted Murder in the Second Degree (Count 1); 2) Criminal Property Damage in the First Degree (Count 2); and 3) Unauthorized Entry into a Motor Vehicle

---

1. The Honorable Joel E. August presided.

(Count 3). After a jury trial, Konohia was found guilty of the following offenses:

Count 1: Attempted Manslaughter based on extreme mental or emotional disturbance, in violation of Hawaii Revised Statutes (HRS) §§ 705–500 and 707–702(2) (1993), as a reduced offense from the charge of Attempted Murder in the Second Degree.

Count 2: Criminal Property Damage in the Fourth Degree, in violation of HRS § 708–823 (1993), as an included offense to the charge of Criminal Property Damage in the First Degree.

Count 3: Unauthorized Entry into a Motor Vehicle, as charged, in violation of HRS § 708–836.5(1) (Supp.2004).[2]

The circuit court sentenced Konohia to concurrent terms of imprisonment of twenty years on Count 1, thirty days on Count 2, and five years on Count 3.

On appeal, Konohia claims that the trial judge erred in 1) admitting into evidence recordings of 911 calls made by the alleged victim and one of Konohia's relatives, and 2) requiring the parties to argue evidentiary issues within the hearing of the jury. We affirm.

## I. BACKGROUND

On September 5, 2000, at about 5:30 p.m., Erik Coral–Sands (Coral–Sands) was driving his van on a dirt road through pineapple fields on his way to the Pauwela Lighthouse. His friend, Joel Lamotte (Lamotte), was a passenger in the van. Coral–Sands stopped his van to let his dogs out to run and then proceeded to drive at a speed that kept pace with the dogs.

Konohia, Randall, and Boniface (collectively referred to as the defendants) were behind Coral–Sands' van in a car owned and being driven by Konohia. The defendants were also headed to the Pauwela Lighthouse to meet with other relatives. The dirt road was narrow and Konohia could not pass the slow-moving van. Konohia honked his horn, flashed his lights, and waved his arms to get Coral–Sands' attention. Coral–Sands stopped his van and went to see what Konohia wanted.

According to Coral–Sands' testimony, the defendants got out of their car, called him a "fucking haole,"[3] and demanded that he let them pass. During the encounter, Boniface slapped a bottle of beer out of Coral–Sands' hand. Coral–Sands returned to his van, drove it forward, and pulled over to the side of the road so that Konohia's car could pass. As Konohia's car drove past the van, the defendants screamed profanities at Coral–Sands. When Coral–Sands drove around the next bend in the road, he saw Konohia's car stopped and blocking the road. Coral–Sands anticipated trouble because he saw the defendants starting to exit the car and noticed one of the passengers carrying a black object which Coral–Sands thought looked like a gun. Instead of stopping, Coral–Sands swerved around the left side of Konohia's car, driving partially onto the pineapple field to get past the car. In the process, Coral–Sands struck the open driver's door of the car, bending it forward.

The defendants got back into the car and began to chase Coral–Sands' van around the pineapple fields. Konohia repeatedly rammed his car into the van in an attempt to push the van off the dirt road and cause it to stop. At one point, Konohia's car got stuck in a pineapple field and Konohia and Boniface left the car to chase the van on foot. Randall, who remained behind, was able to get the car back on the road. Randall caught up to the van and then rammed the

---

2. The jury also found Randall Konohia (Randall) guilty of Assault in the First Degree and Criminal Property Damage in the First Degree and Boniface Konohia (Boniface) guilty of Reckless Endangering in the Second Degree and Unauthorized Entry into a Motor Vehicle. Randall and Boniface did not appeal their convictions or sentences.

3. "Haole" is a Hawaiian word for "Caucasian." Mary K. Pukui and Samuel H. Elbert, *Hawaiian Dictionary* 58 (1986).

car into the side of the van causing the van to flip over. Both Coral–Sands and Lamotte were briefly knocked unconscious as the van came to rest on its roof. Konohia, Randall, and Boniface went to the overturned van as other relatives of Konohia gathered nearby.

Coral–Sands and Lamotte provided the following description of what happened next. Konohia and Randall, both "very agitated," entered the van through the back doors. Coral–Sands was on his knees trying to "duck and cover" behind a couch in the van. Konohia and Randall pushed the couch forward, trying to smash Coral–Sands with the couch. The couch was then pulled out of the van.

Konohia grabbed a walking stick in the van and started jabbing it at Coral–Sands. Coral–Sands picked up a bottle of rubbing alcohol, and as he "wave[d] it about," some of the rubbing alcohol got into Konohia's eyes. Konohia attacked and thrust the walking stick completely into Coral–Sands' left eye with sufficient force to rupture the eye and fracture the eye orbit. Coral–Sands grabbed the stick as it came out of his eye. Konohia continued to jab the stick at Coral–Sands, saying that he was trying to take out Coral–Sands' other eye, and struck Coral–Sands in the face, chest, neck, and back. In the meantime, Randall grabbed a golf club in the van and used it to hit Coral–Sands in the head. The beating continued until Coral–Sands was knocked unconscious. Coral–Sands was rendered permanently blind in his left eye.

Konohia testified to a different version of events. According to Konohia, when he entered the van, Coral–Sands threw rubbing alcohol at the left side of Konohia's face, blurring Konohia's vision. Konohia explained that he picked up a stick because he saw Coral–Sands holding an iron rod. Konohia claimed that he pushed the stick at Coral–Sands after Coral–Sands hit Konohia with the iron rod. Konohia stated that Coral–Sands grabbed the stick and Konohia fell on top of Coral–Sands. Konohia testified that he had "one little fight with the stick" and then twice punched Coral–Sands in the face.

Konohia claimed that he only jabbed the stick at Coral–Sands once and characterized the injury to Coral–Sands' eye as an accident.

## II. DISCUSSION

### A. The Circuit Court Did Not Err in Admitting the Recording of Coral–Sands' 911 Call.

#### 1. Coral–Sands' 911 call

While Coral–Sands' van was being chased around the pineapple fields by Konohia's car, Coral–Sands used his cellular telephone to call 911. Coral–Sands' 911 call, which was recorded, continued through his van rolling-over and the alleged assault in the van. The 911 dispatcher did not terminate the call until the police advised her they had arrived at the scene and located the alleged victim. The recording of Coral–Sands' 911 call was therefore a contemporaneous recording of the events as they unfolded.

Coral–Sands' 911 recording can be separated into two distinct parts. The first part is Coral–Sands' conversation with the 911 dispatcher in which Coral–Sands describes being chased and repeatedly rammed by Konohia's car and asks the police for help. The second part captures the actual sounds of the van being rammed and overturning, the alleged assault within the van, and a conversation between Konohia and Coral–Sands after the alleged assault is over.

The 911 recording begins with Coral–Sands saying that some "local guys" are coming after him and trying to run him off the road. Coral–Sands identifies himself by name to the 911 dispatcher and asks that a "bunch of officers" be sent to the Pauwela Lighthouse immediately. Coral–Sands says that the local guys are crashing their car into Coral–Sands' van and are throwing rocks at him. Coral–Sands gives a running description of what is happening as sounds of his van being rammed can be heard in the background. During a brief lull in the chase, Coral–Sands stops and talks to Vince Souki

(Souki), who was riding a bicycle. Souki advises Coral–Sands to "[g]et out of there." Coral–Sands tells the 911 dispatcher that "these guys are upset and are going to kill me" and that "it's pretty serious."

Just after Coral–Sands declares, "They are coming to ram me again right now!" sounds of a collision and the van rolling over can be heard. There is no further conversation between Coral–Sands and the 911 dispatcher, but Coral–Sands' cellular phone continues to transmit sounds of the ongoing events. Lamotte's moaning can be heard. In addition, there are angry voices apparently directed at Coral–Sands. While it is difficult to decipher much of what these voices are saying, certain phrases such as "We got your ass, fool" and "Yeah baby mother fucker" are audible. While Lamotte is pleading, "Come on man ... please no," sounds of an apparent attack accompanied by shouts of "You bastard!" and "You asshole!" can be heard. Later, after things have calmed down, a conversation between two men, subsequently identified as Coral–Sands and Konohia, can be heard. Coral–Sands complains that Konohia shoved a stick in Coral–Sands' eye. Konohia responds, "That's what you get for banging my car." Konohia also accuses Coral–Sands of trying to "burn my eye with alcohol."

### 2. The trial court's ruling

Prior to trial, the defendants objected to the admission of the recording of Coral–Sands' 911 call. The defendants argued that the State could not identify all the voices on the recording and that Coral–Sands' statements on the recording were hearsay and cumulative since he would be testifying at trial. The trial judge indicated that he felt the recording was admissible under Hawaii Rules of Evidence (HRE) Rule 803(b)(1) (present sense impression), under HRE 803(b)(2) (excited utterance), and as part of the *res gestae*,[4] but reserved ruling until he listened to the recording. After listening to the recording, the judge ordered that certain

comments made by the 911 dispatcher be redacted from the recording. The judge ruled that the redacted recording would be admissible "assuming that a proper foundation is laid for the statements." The redacted recording was admitted into evidence during the trial and played for the jury.

### 3. Konohia's claims

On appeal, Konohia argues that the trial court erred in admitting the recording of Coral–Sands' 911 call. Konohia claims that 1) the recording was not properly authenticated because the State did not identify all the voices on the recording; 2) Coral–Sands' statements on the recording should have been excluded as hearsay; 3) no foundation was laid for the recording's admission as a prior consistent statement; 4) the recording was irrelevant and its probative value was substantially outweighed by the danger of unfair prejudice; and 5) the admission of the recording violated Konohia's right to confrontation under the Hawai'i and United States Constitutions. Konohia's claims are without merit.

> [D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

*Kealoha v. County of Hawaii*, 74 Haw. 308, 319–20, 844 P.2d 670, 676 (1993). The trial court's rulings on authentication under HRE Rule 901 are reviewed for abuse of discretion. *Kam Fui Trust v. Brandhorst*, 77 Hawai'i 320, 326, 884 P.2d 383, 389 (App.1994). The admissibility of evidence based on the

---

4. The trial judge cited *Territory v. Lewis*, 39 Haw. 635 (1953), as a case supporting the admission of the recording as part of the *res gestae*.

application of hearsay rules is reviewed under the right/wrong standard. *State v. Moore*, 82 Hawai'i 202, 217, 921 P.2d 122, 137 (1996). Evidentiary rulings on relevance under HRE Rules 401 and 402 are reviewed under the right/wrong standard while decisions based on HRE Rule 403 are reviewed for abuse of discretion. *Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 350–51, 944 P.2d 1279, 1293–94 (1997).

### a. The recording was sufficiently authenticated to warrant its admission.

■ HRE Rule 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The State introduced the recording of Coral–Sands' 911 call as a contemporaneous recording of the charged criminal episode. Konohia argues that in order to authenticate the recording and establish its admissibility, the State had to identify every voice on the recording or else redact out the unidentified voices. We disagree.

■ The requirement of authentication as a condition precedent to admissibility "represent[s] a special aspect of relevancy." Commentary to HRE Rule 901. When the relevancy of a recording does not depend on the identification of certain voices, those voices need not be identified to establish the authenticity and admissibility of the recording. *See Johnson v. State*, 823 So.2d 1, 24 (Ala. Crim.App.2001) (upholding admissibility of 911 recording despite witness's failure to identify all the voices and noises on the recording).

The recording of Coral–Sands' 911 call captured the actual sounds of the alleged assault, including the sounds of a violent struggle and the tones of voice used by the participants. This portion of the recording, in particular, was relevant and admissible regardless of whether all the voices were identified. It gave the jury a true audio picture of the alleged assault and an accurate context from which to consider the testimony of the witnesses.

We conclude that there was sufficient evidence to authenticate the recording and establish its admissibility. The 911 dispatcher testified that she received a call from an Erik Coral–Sands, that the recording equipment was working properly, and that the State's exhibit was an accurate recording of Coral–Sands' 911 call. The 911 dispatcher verified that the female voice on the recording was her voice. Evidence identifying Coral–Sands' voice was also introduced. Both Coral–Sands and Lamotte testified that Coral–Sands called 911 while he was being chased by Konohia's car. Coral–Sands described certain statements he made during the 911 call that are audible on the recording. Coral–Sands can also be heard on the recording identifying himself by name to the 911 dispatcher.

Lamotte testified that the recording accurately reflected what had transpired after Coral–Sands called 911, including everything that happened in the van. The additional voices of Lamotte, Konohia, Randall, and Boniface were identified on the recording. The voice identification evidence provided a basis for distinguishing the voices of Coral–Sands and Lamotte from the other voices heard during the alleged assault. The State satisfied HRE Rule 901.

### b. The Deputy Prosecuting Attorney's references to statements heard on the recording in closing argument were proper.

■ In her closing argument, the Deputy Prosecuting Attorney (DPA) referred to statements heard on the recording. Konohia argues that the recording was inadmissible because the DPA referred to certain statements made by people whose voices Kononia claims had not been identified. Konohia's argument confuses the admissibility of the recording with whether the DPA's use of the

recording in closing argument was proper.[5] As previously noted, the recording was sufficiently authenticated to be admissible regardless of whether all the voices were identified. A prosecutor is given wide latitude to discuss the evidence and is permitted to draw reasonable inferences from the evidence in closing argument. *State v. Clark*, 83 Hawai'i 289, 304–05, 926 P.2d 194, 209–210 (1996). It would have been improper, however, for the DPA to make arguments based on the recording for which there was no evidentiary support.

We conclude there was sufficient evidence to justify the DPA's closing arguments. Konohia is simply wrong in claiming that the statements the DPA attributed to Coral–Sands or to particular defendants had not been identified. The other statements Konohia cites were not used by the DPA in a manner that required the identification of the particular speaker.

The State identified the significant voices heard on the recording of Coral–Sands' 911 call, including the voices of Coral–Sands, Lamotte, Konohia, Randall, and Boniface. Coral–Sands was identified as the person conversing with the 911 dispatcher. Lamotte testified that he was the person on the recording moaning and who said words to the effect of, "Come on, dude. No, please." Lamotte stated that he uttered these words to beg for Coral–Sands' life while Konohia and Randall were in the van. Lamotte identified Randall as the person saying, "Yeah baby, mother fucker" and later asking Lamotte if he was okay. Lamotte had known Randall from the time Lamotte was in the second grade and they both had lived in the same neighborhood.[6]

Konohia indicated that the voice saying, "Kill 'em. Kill the fucker" was the voice of his cousin Boniface. Konohia also admitted that it was his own voice on the recording telling Coral–Sands that "[y]ou threw alcohol in my face." Konohia's voice was also identified through circumstantial evidence by Souki who stated that he witnessed a conversation between Coral–Sands and Konohia. Souki testified that he heard Coral–Sands ask Konohia why Konohia had poked Coral–Sands' eye out, and that Konohia had responded, "That's what you get, you fucker. That's what you get for banging my car." The basic conversation described by Souki can be heard on the recording.

Konohia complains, in particular, about the DPA's reference to belligerent statements heard on the recording after the van flipped over, including 1) "We got your ass. We got your ass fool"; and 2) "Get out of there you son of a bitch." The DPA did not attribute these statements to a particular defendant, but argued that these statements showed that the defendants had unlawfully entered the van with the intent to commit a crime and not to help the van's occupants.[7] The DPA argued:

> Regarding the unlawfulness of the entry and the intent to commit the crime therein, they didn't enter to help. The 911 tape tells you that. What do they say? We got your ass. We got your ass fool. Get out of there you son of a bitch. F-ing F-er. That's what you hear.

Because the voices of Konohia, Randall, and Boniface as well as the voices of Coral–Sands and Lamotte had been identified on the recording, the DPA was free to invite the

5. After the recording was admitted in evidence, Defendant–Appellant Randy H. Konohia (Konohia) did not ask the trial court to impose limits on the prosecution's use of the recording. Nor did Konohia object to the closing argument of the Deputy Prosecuting Attorney (DPA) on the ground that the DPA's references to statements heard on the recording were not supported by the evidence.

6. The voice of Charla Ann Konohia (Charla Ann), whom Joel Lamotte (Lamotte) knew as "Charie Ann Kaina," was identified by Lamotte as the female voice saying, "You get what you get" on the recording of the 911 call made by Erik Coral–Sands (Coral–Sands). Lamotte recognized Charla Ann by sight and was familiar with her voice since he had gone to school with her from preschool.

7. Proof of unlawful entry with the intent to commit a crime were elements of the Unauthorized Entry into a Motor Vehicle charge.

jury to make its own comparisons regarding the voices on the recording. Konohia testified at length during trial and therefore the jury had an additional basis to identify his voice. It is clear from the recording that the angry statements referred to by the DPA were not made by Coral–Sands or Lamotte. In addition, the cellular telephone picked up sounds made closer to it more clearly. Based on the trial evidence, Konohia, Randall, and Boniface were the only people who entered the van after it flipped over.[8] It therefore stands to reason that the audible statements on the recording not attributable to Coral–Sands or Lamotte were likely made by one of the defendants. There was sufficient evidence to support the DPA's arguments.[9]

### c. Coral–Sands' statements on the recording were admissible as excited utterances.

 Konohia concedes that some of the statements on the recording of Coral–Sands' 911 call do not constitute hearsay under HRE Rule 801[10] because they were not oral assertions offered to prove the truth of the matter asserted. Konohia, however, contends that statements Coral–Sands made in response to the 911 dispatcher's questions and his statement to the 911 dispatcher that "[t]hey're trying to kill me" and "[t]his is serious" were inadmissible hearsay.

**8.** Lamotte identified Konohia and Randall as the individuals who entered the van and assaulted Erik Coral–Sands (Coral–Sands). Although Lamotte testified that he did not see Boniface enter the van, Vince Souki (Souki), who was watching from a distance, identified Boniface as one of the people Souki saw entering the van. Kohohia testified that Boniface was standing right outside the van doors when Konohia was fighting Coral–Sands with the stick. Kohohia also identified Boniface as the person who pulled the couch out of the van.

**9.** Konohia also complains about the DPA's reference to someone saying, "He's hurt, he's hurt" on the recording shortly after the vehicle flipped over. The DPA did not attribute this statement to a particular person, but simply argued that it showed the defendants realized that causing Coral–Sands' van to flip over created a danger of

Coral–Sands' statements to the 911 dispatcher were clearly admissible as excited utterances under HRE Rule 803(b)(2). To qualify as an excited utterance, HRE Rule 803(b)(2) requires that the statement be "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Coral–Sands' statements to the 911 operator easily satisfy these requirements. Coral–Sands' statements were made in the midst of his being chased and rammed by a car carrying three large males whom he believed were trying to kill him. The fact that some of Coral–Sands' statements were made in response to questions by the 911 dispatcher did not prevent them from qualifying as excited utterances. *See People v. Roybal*, 19 Cal.4th 481, 79 Cal.Rptr.2d 487, 966 P.2d 521, 542–43 (1998) (ruling that statements made in response to questions posed by 911 dispatchers and police officer were spontaneous excited utterances).

### d. The recording was not offered as a prior consistent statement.

Konohia's argument that the State failed to meet the foundational requirements for admitting the recording of Coral–Sands' 911 call as a prior consistent statement under HRE Rule 613(c) is misplaced. The State did not offer the recording as a prior consistent statement and thus HRE Rule 613(c) was inapplicable.

serious bodily injury, an element of the Criminal Property Damage in the First Degree charge. Konohia also complains about the DPA's reference to Konohia's saying to Coral–Sands that "you were stuffing me with a golf club in the middle." There was sufficient evidence to identify Konohia as the person who made this statement. The statement was made during a conversation between Coral–Sands and Konohia in the aftermath of the alleged assault during which Konohia attempted to justify his actions. Souki testified that he witnessed the conversation, and Konohia identified his voice as making other statements during the conversation.

**10.** Hawaii Rules of Evidence (HRE) Rule 801 defines "hearsay" as follows:
"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

**e. The recording was relevant and its probative value outweighed the danger of unfair prejudice.**

■ Konohia claims that the recording of Coral–Sands' 911 call should have been excluded as irrelevant under HRE Rule 402 and because its probative value was substantially outweighed by the danger of unfair prejudice under HRE Rule 403. Konohia's claims are without merit.

The recording was among the most probative and reliable evidence presented at trial. It was a contemporaneous recording of the actual events that formed the basis of the criminal charges against Konohia and his co-defendants. The recording contained Coral–Sands' real-time description of his van being chased and rammed, his expression of fear, and the sounds of the repeated ramming of Coral–Sands' van. After the van flipped over, the recording captured the actual sounds and atmosphere of the alleged assault, including angry and threatening voices directed at Coral–Sands and incriminating statements made by Konohia in the aftermath of the alleged assault. The recording provided compelling proof of the defendants' actions and intent. It was particularly relevant given Konohia's claim that his gouging of Coral–Sands' eye was accidental and in self-defense.

The recording was indeed prejudicial to Konohia because it helped to prove the charged offenses and to refute his claim of self-defense and accident. "Probative evidence always 'prejudices' the party against whom it is offered because it tends to prove the case against that person." *State v. Klafta*, 73 Haw. 109, 115, 831 P.2d 512, 516 (1992). HRE Rule 403, however, is only directed at excluding evidence where there is a danger of *unfair* prejudice. Here, the recording was extremely probative and not unfairly prejudicial. It was not subject to exclusion under HRE Rule 403. *See State v. Williams*, 235 Kan. 485, 681 P.2d 660, 666–67 (1984) (upholding admission of 911 call that recorded an ongoing sexual assault and rejecting a claim that the recording was more prejudicial than probative).

**f. Konohia is not entitled to any relief based on his confrontation claim.**

■ Konohia claims that the admission of the recording of Coral–Sands' 911 call violated his confrontation rights because the recording included hearsay statements made by declarants whom the State failed to establish were unavailable and because the hearsay statements did not bear adequate indicia of reliability. Konohia did not object on these grounds at trial and therefore his claim is reviewed under the plain error standard. *See State v. Matias*, 57 Haw. 96, 100–01, 550 P.2d 900, 903–04 (1976).

There is no confrontation issue with respect to Coral–Sands' statements on the recording. Coral–Sands testified at trial and was subject to cross-examination. *United States v. Owens*, 484 U.S. 554, 558–60, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988) (holding that the Confrontation Clause under United States Constitution is satisfied if the declarant is available for cross-examination). Moreover, to the extent Coral–Sands' statements were offered for their truth, they were excited utterances, a firmly rooted hearsay exception bearing adequate indicia of reliability. *In the Interest of John Doe, born on November 23, 1970*, 70 Haw. 32, 38, 761 P.2d 299, 303 (1988).

Konohia's main contention is that the recording contains several hearsay statements made by unidentified background voices during the alleged assault. With one exception, Konohia does not specify the statements to which he is referring, explain why he alleges the statements were offered to prove their truth, nor explain why, if offered for their truth, the admission of the statements resulted in prejudice. The only statement Konohia identifies is someone saying, "He's hurt, he's hurt" after the van flipped over. The DPA, however, did not use this statement for its truth, but argued that it provided evidence of the defendants' state of mind. *See* footnote 9, *supra*. The statement was therefore not hearsay and, accordingly, did not implicate Konohia's confrontation rights. *Tennessee v.*

*Street,* 471 U.S. 409, 413–14, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985) (holding that the use of evidence for a nonhearsay purpose did not raise Confrontation Clause concerns). In any event, there was no dispute that Coral–Sands had been injured.

Konohia's failure to specify the additional statements he contends were used for their truth precludes us from analyzing those statements. Our review of the record does not support Konohia's contention that audible statements made during the alleged assault were offered or used for their truth. These statements were probative because of the angry, violent, and threatening tone of the voices involved in attacking Coral–Sands and encouraging the attack. The statements were not used for the truth of what was said, but to show the defendants' intent and to negate Konohia's claim of accident or self-defense. Because the statements were not offered for a hearsay purpose, the admission of the statements did not violate Konohia's confrontation rights. *Street,* 471 U.S. at 413–14, 105 S.Ct. 2078. Konohia has not met his burden of showing plain error regarding his confrontation rights.[11]

**B. Any Error in Admitting the Recording of Charla Ann Konohia's 911 Call Was Harmless Beyond a Reasonable Doubt.**

■ After the van flipped over, Konohia's cousin, Charla Ann Konohia (Charla Ann), called 911 on a cellular telephone while standing near the van. Most of Charla Ann's statements are inaudible, with the 911 dispatcher instructing Charla Ann to call back because the reception was poor. In the brief portions of the call that are audible, Charla Ann makes statements, including: "these two

drunk haoles tried to run my cousins them off the road"; "they just flipped"; "there is somebody hurt"; and "just send somebody, these guys are drunk, and they're going to get killed."

Konohia argues that the court erred in admitting the recording of Charla Ann's 911 call. We need not reach this issue because any error in admitting this recording was harmless beyond a reasonable doubt. The recording of Charla Ann's 911 call was merely cumulative of the recording of Coral–Sands' 911 call and other properly admitted evidence. *See, e.g., State v. Crisostomo,* 94 Hawai'i 282, 290, 12 P.3d 873, 881 (2000) (concluding that any error in admitting evidence that was merely cumulative was harmless). Charla Ann's 911 recording added little, if anything, to the State's evidence against Konohia and also provided evidence favorable to the defense.

**C. The Trial Court Did Not Abuse Its Discretion in Discouraging Bench Conferences and Requiring the Parties to Raise Certain Evidentiary Objections in Front of the Jury.**

■ Konohia argues that the trial court abused its discretion in requiring that legal arguments on the admissibility of evidence be made within the hearing of the jury. He contends that this practice was unduly prejudicial because it exposed the jury to improper comment on the proffered evidence, thereby depriving him of a fair trial. We disagree.

Contrary to Konohia's suggestion, the trial judge did not prohibit bench conferences or force the parties to present legal arguments on evidentiary matters in front of the jury. The trial judge was concerned about *unnec-*

---

**11.** We note that even if any statements on the recording made by Konohia, Randall, or Boniface were offered for their truth, this would not have violated Konohia's confrontation rights. The use of Konohia's statements would not violate his confrontation rights because Konohia has no right to confront himself. *State v. Patino,* 177 Wis.2d 348, 502 N.W.2d 601, 611 (1993). Randall and Boniface exercised their right not to testify at trial and thus were unavailable. Any

hearsay statements made by Konohia, Randall, or Boniface were admissible as admissions under HRE Rule 803(a)(1)(A) or as co-conspirator statements under HRE Rule 803(a)(2)(C). These are both firmly rooted hearsay exceptions which bear adequate indicia of reliability for confrontation purposes. *State v. McGriff,* 76 Hawai'i 148, 156, 871 P.2d 782, 790 (1994) (co-conspirator statements); *Patino,* 502 N.W.2d at 611 (admission of party-opponent).

*essary* bench conferences that were slowing the presentation of evidence and diverting the jury's attention. Thus, on the third day of trial, the judge informed the parties that he was discouraging the parties from requesting bench conferences unless necessary.

> I think I have been perhaps too liberal in permitting bench conferences. I think that several of them have been unnecessary in the sense that the same objections could have been made from the bench [ (sic) ], and that many of them would not have involved any kind of prejudice to one party or another.
>
> The jury is now groaning every time somebody requests a bench conference, and in part I take the blame for that, because I think I granted too many bench conferences.
>
> So from here on in, I would like the parties to be extremely cautious about when they request a bench conference. If you want to make an objection, you have every right to do so and I welcome you to do so. I would like you to state what the objection is. Cite the rule of evidence that you are referring to.
>
> And if you absolutely are certain that the contents of that will have the tendency to prejudice one side or the other, you may then request a bench conference. Otherwise, I would request that you not have any more bench conferences.

Although discouraging bench conferences, the trial judge continued to permit counsel to argue objections at side bar. For example, the judge subsequently permitted a bench conference requested by Konohia's counsel to raise objections to the anticipated testimony of the State's hair and fiber expert. The judge also *sua sponte* asked counsel to come to the bench to argue whether Coral–Sands would be allowed to display his injured eye to the jury.

The trial judge has broad discretion to determine whether an objection regarding the admission of evidence will be made in the jury's presence or at a bench conference. *United States v. Hanif,* 1 F.3d 998, 1002 (10th Cir.1993); *see State v. Kelekolio,* 74 Haw. 479, 529 n. 24, 849 P.2d 58, 80 n. 24 (1993). We review the trial judge's decision on this issue under the abuse of discretion standard. *Kealoha,* 74 Haw. at 319–20, 844 P.2d 670. The applicable rules of evidence to guide the trial judge's exercise of discretion are as follows: 1) HRE Rule 611(a) states that the court shall "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to ... avoid needless consumption of time"; 2) HRE Rule 103(c) provides that "[i]n jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means"; 3) HRE Rule 104(c) provides that hearings on preliminary matters shall be conducted out of the hearing of the jury "when the interests of justice require"; and 4) HRE Rule 1102 provides that the court shall instruct the jury on the applicable law, "but shall not comment upon the evidence."

We conclude that the trial judge did not abuse his discretion. Because the trial judge only discouraged and did not prohibit bench conferences, Konohia's claim of error on appeal can only be based on instances in which his requests for bench conferences were denied. He waived any claim of error where he did not request a bench conference or object to arguing in front of the jury. We find no error in the few instances in which the trial court rejected Konohia's request to argue an objection at side bar.

Nor does our review of the record show that arguing evidentiary matters in the jury's presence resulted in any prejudice to Konohia that affected his substantial rights. This is true even if we consider the instances cited by Konohia in which no bench conference was requested. The evidentiary objections and supporting legal arguments made by the parties did not go beyond the type of objections and arguments routinely made in the jury's presence during trials. Where Konohia's objections involved evidence that was ultimately admitted, Konohia suffered no

prejudice in having to argue in front of the jury. *International Merger & Acquisition Consultants, Inc. v. Armac Enterprises, Inc.,* 531 F.2d 821, 824 (7th Cir.1976) (holding that the federal rule identical to HRE Rule 103(c) is inapplicable where the evidence is properly admitted). In the instances where Konohia's evidentiary objections were sustained, we discern no prejudice in his counsel having to argue in front of the jury.[12]

We reject Konohia's claim that the trial judge improperly commented on the evidence in ruling on the parties' objections. The judge's statements did not exceed what was necessary and appropriate to explain his rulings on objections. Finally, any potential prejudice resulting from arguing evidentiary matters in the jury's presence was cured by the trial judge's instructions to the jury. The judge instructed the jury that it should not consider objections raised by counsel; that statements or remarks by counsel were not evidence; that the jury must disregard any remarks made by the judge other than jury instructions; that the jury must disregard any statement or action by the judge suggesting that he was inclined to favor the claims or positions of any party; and that the jury must disregard any expression or statement by the judge that seemed to indicate that he held an opinion on the credibility of witnesses or on what facts had been established. We presume that the jury followed these instructions. *State v. Knight,* 80 Hawai'i 318, 327, 909 P.2d 1133, 1142 (1996).

### III. CONCLUSION

We affirm the September 26, 2002 Judgment of the Circuit Court of the Second Circuit.

---

12. For example, the trial judge sustained Konohia's objection when the DPA asked a police officer if the police report indicated whether Konohia had been drinking. Konohia, however, admitted in his testimony that he had four or five beers before his encounter with Coral–Sands. The trial judge also sustained Konohia's objection when the DPA asked a police officer whether Konohia was related to a Maui Police Department (MPD) sergeant. The DPA was attempting to show that Konohia could have contacted the MPD sergeant instead of taking matters into his own hands. Konohia, however, later testified that the MPD sergeant was his father-in-law.